IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 26, 2010

## STATE OF TENNESSEE v. GEORGE JOHN BYRD

**Direct Appeal from the Criminal Court for Knox County**
**No. 87532     Bob R. McGee, Judge**

---

**No. E2009-02091-CCA-R3-CD - Filed November 15, 2010**

---

The Defendant-Appellant, George John Byrd, was convicted by a Knox County jury of three counts of aggravated rape, a Class A felony, and one count of aggravated assault, a Class C felony. He was sentenced to twenty-five years for each aggravated rape and to twelve years for aggravated assault. The trial court ordered the sentences to be served concurrently, for an effective sentence of twenty-five years in the Tennessee Department of Correction. The sole issues presented for our review are whether the trial court erred by (1) allowing testimony of certain thefts by Byrd; and (2) allowing a nurse to testify about statements made by the victim during her medical examination. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. JAMES CURWOOD WITT, JR., J., concur in results only.

Michael Graves (at trial), J. Liddell Kirk (on appeal), Knoxville, Tennessee, for the Defendant-Appellant, George John Byrd.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

**Trial**. The proof adduced at this trial was extremely graphic in nature. Because the only issues presented in this appeal concern the admissibility of certain testimony, we will forego outlining fully the evidence adduced at trial. This is a case in which the victim was

repeatedly raped, orally, vaginally and anally, by her ex-husband, Byrd, the Defendant-Appellant. Byrd claimed that the instant sexual encounter was consensual.

Byrd and the victim married in October of 2006 and later experienced some problems which forced the victim to move to another city. Upon her return, the victim was granted an order of protection against Byrd. The victim testified that Byrd had committed violence against her in the past. In February of 2007, the victim reunited with Byrd. She said he had a drug problem and promised to seek rehabilitation.

The instant offenses are precipitated by events that occurred on May 22, 2007, while Byrd and the victim were celebrating his birthday at his apartment with two of his friends. The victim said Byrd and his two friends drank alcohol and ingested cocaine. They began partying in the early afternoon and continued through the night. The victim denied consuming alcohol or cocaine. She was upset because Byrd was using drugs and his ex-girlfriend was at their apartment. The victim testified that Byrd believed she had ruined his party and said that she "was going to pay for being a bitch[.]" The victim was afraid that Byrd was going to hurt her later. At the time of the party, she had been awake for three days. The victim claimed Byrd was on an extended drug binge, and he would not let her go to sleep.

Around 6:30 that next morning, Byrd told the victim that it was time to go to bed. The victim said they went to their bedroom while Byrd's friends continued to drink downstairs. The victim sat on her bed with Byrd. She testified that he ordered her to perform oral sex. Byrd then told the victim that he was going to have anal sex with her. She said he held her hands down, pulled down her shorts, and penetrated her anus with his penis. The victim then testified that Byrd grabbed her head again, put it on his penis, and forced her to perform oral sex against her will. Although the victim testified that she was unsure of how many times she went from performing oral sex to being penetrated by Byrd, the record shows that Byrd forced her to perform oral sex at least three times, anal sex twice, and vaginal sex once. None of these sex acts were performed with her consent.

The victim said she did not cry for help because Byrd threatened to kill her and his friends if they came into the bedroom. The victim testified that she and Byrd eventually fell asleep. She woke up thirty minutes later when the phone rang. After she got off of the phone, she went to the restroom. The victim then went downstairs and left the house. She ran to a ministry and called her sister. She then dialed 9-1-1 and was transported to the hospital by an ambulance.

The victim testified that she had pain in her rectum for approximately two weeks after she was raped. She also experienced pain in her vagina. The victim had blood in her vagina;

however, she was unsure if the blood was attributed to her period.

On cross-examination, the victim said she obtained the order of protection against Byrd in February of 2007. The order was based on conduct that occurred the previous November. When the order was issued, the victim had not gotten back together with Byrd. She did not know whether the order was served on Byrd. On May 3, the victim had the order changed from a no-contact order to a social-contact order. She said Byrd was served with the order at this time. The victim believed the order was necessary because she was afraid of Byrd.

The victim testified that Byrd began a drinking binge two days before his birthday. Over the two days, she said they repeatedly went to get beer and drugs. She said Byrd ingested a pill on his birthday; however, she did not know what it was. He also smoked cocaine and "shot it up." She said Byrd had been awake for three straight days by the end of his birthday. The victim further testified that neither she nor Byrd were employed when these offenses occurred. They lived in government housing, received food stamps, and were given money by Byrd's mother and sister. The victim was not aware of the Victim Injury Compensation Fund before the offenses occurred.

On redirect examination, the victim testified that she accepted roughly a dozen phone calls from Byrd. She said Byrd tried to persuade her not to come to court. The victim was questioned about how Byrd had money to purchase drugs. She stated, "He was stealing fishing reels from Wal-Mart, taking them back and getting a gift card, selling the gift card to get the cash to get the drugs." The victim said Byrd drank alcohol on a daily basis. She estimated that he drank at least a twelve-pack of beer every day. Byrd also used drugs on a daily basis when they were available. She said he was high and drunk on his birthday; however, he was able to function fairly normally. The victim testified that she sought the order of protection because Byrd held a knife to her throat and made threats against her.

A nurse from the Safe Haven Crisis and Recovery Center for Sexual Assault testified that she examined the victim on May 23, 2007. She took four swabs from the victim's mouth and conducted a pelvic exam. She said there was blood on the victim's inner thighs and inside her vagina. However, the victim reported that she was about to start her menstrual cycle; therefore, the nurse could not determine whether the blood resulted from the assault. The nurse noted no tears in the victim's vagina or any redness. The nurse performed an anal observation and noticed a hemorrhoid, which she believed was older. However, she did not see any tears or external bleeding. She did, however, observe a blue bruise. The nurse did not conduct an internal examination of the anus. She said the victim complained of tenderness in her pubic area. The nurse testified that this complaint was common among

sexual assault victims. She did not recall the victim's complaining of rectal pain and stated that the victim was tender during the exam of her external anus.

The nurse testified that the victim "seemed very scared. She had reported to me that she feared for her life[.]" She said the victim told her about the sexual assaults and that Byrd had a knife on the dresser. The victim also reported that Byrd verbally threatened her. Blackburn explained that the victim's vaginal pain could have been caused by consensual sex.

Byrd testified that he was married to the victim for less than a year. On May 3, 2007, he agreed to sign an order of protection that permitted social contact with the victim. Byrd denied the allegations in the order; however, he signed it because he wanted to make the victim happy. Byrd denied stealing rods and reels from Wal-Mart.

Byrd testified that he celebrated his birthday on May 22, 2007. He drank "a lot" of alcohol with his friends, Christina Paschal and her boyfriend. He also used cocaine three or four times. Byrd said the victim was upset throughout the night because he was using drugs. She was also mad because Paschal was at the apartment. Byrd denied that he forced the victim to stay awake throughout the night. He said the victim stayed awake because she was afraid Paschal would make a pass at him. Byrd stated that he went to bed at about 6:30 a.m. He said he placed a pocket knife on the dresser. He denied opening the blades of the knife and threatening the victim.

Byrd claimed he had consensual sex with the victim. He said he was "[r]eally drunk" because he had consumed nineteen to twenty beers. Byrd testified the victim initiated the sex. She specifically asked if he wanted to have anal sex. He stated that they had vaginal sex, anal sex, and oral sex. Byrd said he eventually fell asleep. The victim woke him up because he had urinated on the bed. He changed the sheets before going back to sleep. Byrd said the adult video in his room belonged to him and the victim. He testified that they watched the video together many times. Byrd said he and the victim had an extravagant sex life.

Byrd testified that the victim was "real obsessed" with him. She became upset very easily. She did not like him going to the store by himself. She also became upset when he talked to other women. Byrd acknowledged that he had phone conversations with the victim while he was in prison. He admitted that he apologized to her for what had happened. Byrd said he apologized because he wanted to make the victim happy. He maintained that he was innocent. Byrd believed the victim made the false allegations because she was angry at him.

On cross-examination, Byrd said he got back together with the victim in March of 2007. He continued to drink alcohol and occasionally use drugs. Byrd stated that the victim did not use drugs or alcohol. He acknowledged that he ran away from his apartment when he saw the police. Byrd stated, "I always run when I see the police. I'm diagnosed paranoid schizophrenic." Byrd could not remember whether he was convicted of theft in 2005.

Byrd said he called the victim over a hundred times from jail. During those phone calls, he professed his love to her. He also asked that she drop the charges against him. Byrd said the victim never claimed she lied about being raped; rather, she insisted that she was raped. Byrd acknowledged that he told the victim that he was responsible for what happened to her. He said he made this admission because he wanted to calm her down. Byrd stated, "Everyone knew she was lying" and that the victim had previously claimed that an ex-boyfriend raped her daughter.

Following the proof at trial, the jury convicted Byrd of three counts of aggravated rape and one count of aggravated assault. He filed a motion for new trial and an amended motion for new trial. This motion was overruled. Byrd filed a timely notice of appeal.

## ANALYSIS

**I. Testimony Regarding the Thefts**. Byrd claims the trial court should not have allowed the victim to testify about how Byrd stole from Wal-Mart so that he could afford to purchase drugs. He argues that the victim's testimony was not relevant. Byrd also claims he was prejudiced by the victim's testimony because it characterized him as a thief. In response, the State argues that the victim's testimony was admissible because it went to Byrd's credibility. The State contends the defense made the victim's credibility an issue when it "implied that the victim's version of [the] events could not be true based on their finances." The State also argues that any error on the part of the trial court was harmless.

The Tennessee Supreme Court has generally held, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); and State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or [reaches] a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)).

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Whether evidence is relevant is a decision left to the discretion of the trial court, and this court will not will not overturn a trial court's determination regarding relevancy without a showing that the trial court abused its discretion. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

Here, the evidence at issue concerned Byrd's ability to afford drugs and alcohol. On cross-examination, the victim testified that she and Byrd were not employed at the time of the offenses. She said they lived in government housing, received food stamps, and had relied on Byrd's sister and mother for financial support. The victim testified that Byrd consumed drugs and alcohol throughout the two days leading up to his birthday party. She stated, "We drove around and he kept going to Wal-Mart getting beer and going to get drugs and going to get more beer." The victim testified that Byrd also purchased cocaine and beer on the night of his birthday party. She said Byrd purchased two eighteen-packs of beer. He also made an additional trip for beer later that night.

A bench conference was held before the State questioned the victim on redirect examination. The State argued that the defense opened the door to questions about how Byrd could afford to purchase drugs. The trial court agreed, stating:

> [T]he issue has been raised about them going out and buying cocaine and buying beer. And at the same time, the question is asked, did he have a job, did you have a job, did he have any income. So I think now there is a plausible basis to argue to this jury that . . . the victim's testimony is unlikely because of the lack of money to buy the things she says that they went out and got. So I think that's been raised now, so I'll allow that in, too.

On redirect examination, the State questioned the victim as follows:

STATE:     How . . . was it possible for [Byrd] to purchase this dope that he was doing?

VICTIM:    Always?

STATE: Well, I meant on that night.

VICTIM: He was stealing fishing reels from Wal-Mart, taking them back and getting a gift card, selling the gift card to get the cash to get the drugs.

STATE: And that's how he bought the drugs for that night?

VICTIM: Correct.

In viewing the transcript, the trial court did not abuse its discretion by permitting the victim to testify about how Byrd stole from Wal-Mart so that he could afford to purchase drugs. We agree with the State that the victim's testimony was relevant under Rule 401 of the Tennessee Rules of Evidence. The victim's testimony reflected upon her credibility, which became particularly important after she was questioned by the defense on cross-examination. See State v. Darrell Wayne Syler, No. E2003-02626-CCA-R3-CD, 2004 WL 2039809, at *2 (Tenn. Crim. App., at Knoxville, Sept. 13, 2004) ("A witness's credibility is always relevant."); State v. West, 844 S.W.2d 144, 149 (Tenn. 1992) ("The particular trait of truthfulness . . . is always an issue when a witness testifies."). The defense asked numerous questions about Byrd's difficult financial situation. It then inquired about whose money was used to purchase the beer. The defense's line of questioning implied that Byrd did not have the means to purchase drugs or alcohol. As a result, the State was permitted to ask the victim about the source of Byrd's money in order to rehabilitate her credibility. See State v. Torrez Talley, No. W2003-02237-CCA-R3-CD, 2006 WL 2947435, at *15 (Tenn. Crim. App., at Jackson, Oct. 16, 2006); State v. Frederick H. Gonzales, Jr., No. M2000-03219-CCA-R3-CD, 2002 WL 31487520, at *2 (Tenn. Crim. App., at Nashville, Oct. 29, 2002); State v. James P. Stout, No. 02C01-9812-CR-00376, 2000 WL 202226, at *20 (Tenn. Crim. App., at Jackson, Feb. 17, 2000). The trial court did not abuse its discretion by finding that the victim's testimony was relevant.

We note that Byrd did not allege that the victim's testimony was inadmissible under Rule 404(b) of the Tennessee Rules of Evidence. This rule addresses evidence of other crimes, wrongs, or acts offered to prove the character of a person and to show that the person acted in conformity with a character trait. Rule 404(b) would apply to the present situation because the victim alleged that Byrd committed theft. Nonetheless, Byrd did not explicitly mention Rule 404(b) during the bench conference, in his motion for new trial, or in his appellate brief. This issue is therefore waived. See T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); T.R.A.P. 3(e) ("[I]n all cases tried by a jury, no issue presented for

review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). We decline plain error review of this issue because it does not rise to the level of affecting a substantial right that would necessitate review in order to do substantial justice. See T.R.A.P. 36(b); see also State v. Ricky E. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App., at Nashville, Sep. 11, 2007) ("[R]arely will plain error review extend to an evidentiary issue."). This court has stated that plain error "must be of such a great magnitude that it probably changed the outcome of the trial." State v. Adkisson, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). Here, in considering the nature of the prior bad acts and the overwhelming evidence at trial, any potential error on the part of the trial court would not have affected the outcome of the trial. Byrd is not entitled to relief on this issue.

**II. Nurse Testimony Regarding Victim's Statements**. Byrd claims the trial court should not have allowed the nurse to testify about particular statements made by the victim during her medical examination. He contends the victim's statements were not made for purposes of medical diagnosis or treatment, and therefore the nurse's testimony constituted inadmissible hearsay. The State argues that the nurse's testimony was not hearsay because it was not offered to prove the truth of the matter asserted. It claims that the testimony was offered only to rehabilitate the victim's credibility. The State also asserts that any error on the part of the trial court was harmless.

According to Rule 801(c), hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Rule 802 provides that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Recently, there has been disagreement as to whether the standard of review regarding the admissibility of hearsay is an abuse of discretion standard or a de novo without a presumption of correctness standard. In Pylant, the Tennessee Supreme Court noted Judge Witt's dissent, wherein he concluded that the admissibility of hearsay statements is a question of law and is reviewed under the de novo without a presumption of correctness standard, rather than under the abuse of discretion standard. Pylant, 263 S.W.3d at 871 (citing State v. Dennis Pylant, No. M2005-02721-CCA-R3-PC, 2007 WL 1890178, at *12 (Tenn. Crim. App., at Nashville, June 29, 2007) (Witt, J., dissenting) (citations omitted), rev'd, 263 S.W.3d 854 (Tenn. 2008). In Pylant, the supreme court also noted Judge Witt's opinion in State v. David Kyle Gilley regarding hearsay:

> In his dissent, Judge Witt, citing Russell v. Crutchfield, 988 S.W.2d 168, 170 (Tenn. Ct. App. 1998), advocates for review of the post-conviction court's rulings on whether the proffered testimony was hearsay under a de novo

standard of review. Pylant, 2007 WL 1890178, at *12 (Witt, J., dissenting). As Judge Witt has previously noted,

> [When presented with a hearsay objection, a] trial court's first duty is to determine whether the out-of-court declarant's statement is hearsay-that is, whether it is "offered in evidence to prove the truth of the matter asserted." No factual issue attends this determination, and it necessarily is a question of law. If the statement is offered to prove the truth of the matter asserted and no exceptions apply, the statement is, purely and simply, inadmissible. At this juncture, the court has no discretion to hold otherwise, and to utilize an abuse of discretion standard at this point in the analysis "'would have us defer to a discretion that the trial court does not possess.'" State v. Edison, 9 S.W.3d 75, 78 (Tenn. 1999) (quoting State v. Edison, No. 03C01-9605-CC-00199, 1997 WL 1526501, at *8 (Tenn. Crim. App. June 18, 1997) (Tipton, J., concurring)).

> State v. Gilley, [297 S.W.3d 739, 760 (Tenn. Crim. App. 2008)] (citations omitted) (emphasis added). Although this Court continues to believe that questions concerning the admissibility of evidence are reviewed under an abuse of discretion standard, we note that, in this instance, the post-conviction court committed error under either standard of review.

Pylant, 263 S.W.3d at 871. In reviewing this issue, we will apply an abuse of discretion standard.

Byrd claims the trial court improperly admitted hearsay evidence during the direct examination of the nurse. The State questioned the nurse about her discussions with the victim during the medical examination. Specifically, the State asked, "Did [the victim] make any complaint to you that any form of coercion was used during the course of this assault?" The defense objected based on hearsay. The trial court ruled that the State could question the nurse about whether coercion was used. It stated:

> It would . . . be the understanding of the Court that the reason for this questioning to be done altogether was [sic] medical, to find out what things had been done and that would direct the examination, what things or clues they would look for.

At this point, it does not appear that there's been any thought of bringing in the police or starting a prosecution, so I don't think that we're looking at testimonial evidence under Crawford, and it would appear to be that the purpose of this was . . . to give her treatment, whatever treatment she might need. And whether or not there was coercion could cause them to look for other things, things they might not look for if no coercion was used. So I'll let it in.

After the trial court made its ruling, the following testimony was given:

> NURSE: Mrs. Byrd had reported that there was a knife, but I don't recall if the knife was at the bedside. I don't–I cannot say that there was a knife used in the assault.
>
> STATE: Any other form of coercion that she mentioned?
>
> NURSE: He did make verbal threats at her. At one point, she said that she was crying, begging him not to, and she reported that he said that if his friends heard her that he would kill everyone.

The first step in any hearsay analysis is determining whether the evidence was offered to prove the truth of the matter asserted. Evidence which is not elicited for this purpose is not considered hearsay under Rule 801(c). The State claims that the nurse's testimony was offered to rehabilitate the victim's credibility, and not to prove that Byrd was coercive. It asserts that it "elicited testimony from the sexual assault nurse to corroborate the victim's testimony that the defendant threatened to kill her." The State contends that the victim's credibility was challenged, and therefore evidence of her prior consistent statements was admissible.

The Tennessee Rules of Evidence do not set forth a hearsay rule addressing prior consistent statements. This court has noted that "the drafters of the Tennessee Rules of Evidence refused to adopt the federal hearsay rule dealing with prior consistent statements, 801(d)(1)(B);[1] rather, existing Tennessee law, derived from the common law, was left intact."

---

[1]F.R.E. 801(d)(1)(B) states:

(d)Statements which are not hearsay. A statement is not hearsay if--

(continued...)

State v. Terry Stephens, No. 01C01-9709-CR-00410, 1998 WL 603144, at *4 (Tenn. Crim. App., at Nashville, Aug. 24, 1998); see also State v. Cyrus Deville Wilson, No. 01C01-9408-CR-00266, 1995 WL 676398, at *4 (Tenn. Crim. App., at Nashville, Nov. 15, 1995). Case law has established circumstances under which a prior consistent statement is not considered hearsay. In State v. Benton, 759 S.W.2d 427 (Tenn. Crim. App. 1988), this court stated:

> [U]nder general evidentiary rules, prior consistent statements may be admissible, as an exception to the rule against hearsay, to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied. But before prior consistent statements become admissible, the witness' testimony must have been assailed or seriously questioned to the extent that the witness' credibility needs shoring up.

Id. at 433-34; see also Floyd "Butch" Webb v. State, No. E2006-02352-CCA-R3-PC, 2007 WL 2570201, at *13 (Tenn. Crim. App., at Knoxville, Sept. 7, 2007); State v. Reginald Henderson, No. W2000-00607-CCA-R3-CD, 2001 WL 912759, at *9 (Tenn. Crim. App., at Jackson, Aug. 10, 2001); State v. Gerald Leander Henry, No. 01C01-9505-CR-00161, 1999 WL 92939, at *27 (Tenn. Crim. App., at Nashville, Feb. 25, 1999); Terry Stephens, No. 01C01-9709-CR-00410, 1998 WL 603144, at *4; State v. John D. Joslin, No. 03C01-9510-CR-00299, 1997 WL 583071, at *34 (Tenn. Crim. App., at Knoxville, Sept. 22, 1997); Cyrus Deville Wilson, 1995 WL 676398, at *4. A prior consistent statement that is admitted to rehabilitate a witness is not considered hearsay because it is not offered "to prove the truth of the matter asserted in the statement." See State v. Fredrick Arnaz Miller, No. E2005-01583-CCA-R3-CD, 2006 WL 2633211, at *11 (Tenn. Crim. App., at Knoxville, Sept. 14, 2006) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 8.01[9] (5th ed.2005)); see also John D. Joslin, 1997 WL 583071, at *34.

The proof at trial amounted to a swearing match between the victim and the Defendant-Appellant. On cross-examination, the defense certainly implied that the victim made up the allegations against Byrd. It suggested that Byrd was physically incapable of

_____

[1](...continued)
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, or (C) one of identification of a person made after perceiving the person[.]

committing the alleged sexual acts based on his lack of sleep and the amount of drugs and alcohol he had consumed. The defense asked, "Even after all he had drank and all . . . the morphine and the cocaine he had, he still had the strength to hold you down and to rape you for four hours straight; is that right?" The defense also implied that the victim made the false accusations because she was jealous of Byrd's ex-girlfriend and his ex-wife. Additionally, the defense suggested that the victim had a financial incentive to lie. The defense questioned the victim about her limited financial resources and then asked if she was aware of the Victim Injury Compensation Fund. The defense implied that the victim lied about her sex life with Byrd. It asked whether the victim and Byrd used the phrase "just breathe" in the context of anal sex. Lastly, the defense referred to phone calls between the victim and Byrd, during which the victim said she was going to drop the charges.

The foregoing evidence questioned whether Byrd actually threatened the victim in their bedroom. As a result, the State was permitted to ask the nurse about the victim's prior statements. These statements were consistent with the victim's testimony on direct examination. Based on the rule articulated in Benton, the nurse's testimony was not hearsay because it was not offered for the truth of the matter asserted. See Benton, 759 S.W.2d at 433-34. Therefore, the trial court did not abuse its discretion by admitting the nurse's testimony. See Benton, 759 S.W.2d at 433-34. Byrd is not entitled to relief on this issue.

We note that Byrd also argues that nurse's testimony was inadmissible because the victim's statements were testimonial in nature. He cites to Crawford v. Washinton, 541 U.S. 36, 124 S. Ct. 1354 (2004), thereby implying that his constitutional rights were violated under the Confrontation Clause. Even if we assume the victim's statements were testimonial, the Confrontation Clause was not violated because the victim was available to be questioned about the statements. See id. at 541 U.S. at 59, 124 S. Ct. at 1369 n. 9 ("The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."). This argument is without merit.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

-12-